UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

NEW CINGULAR WIRELESS    No. 2:07-cv-02213-MCE
SERVICES, INC.,

    Appellant,

  v.                       MEMORANDUM AND ORDER

RICHARD McCORMICK et al.,

    Appellees.

New Cingular Wireless Services, Inc. ("New Cingular" or "Appellant") is a creditor of Wire Comm Wireless, Inc. ("Wire Comm" or "Debtor"). After Wire Comm filed for Chapter 7 bankruptcy protection, New Cingular filed a proof of claim in the amount of $2,949,703.17. The claim arises out of advances and commissions New Cingular contends Wire Comm retained when it was a dealer of New Cingular products and services. Before Wire Comm filed for bankruptcy, New Cingular brought an action against Wire Comm and its principal shareholders, Timothy, Renee, Richard, and Shirley McCormick ("the McCormicks"), alleging alter ego fraudulent transfer, and alter ego aiding and abetting fraudulent transfer.

The Chapter 7 Bankruptcy Trustee, Michael F. Burkart ("Trustee") moved to approve a compromise with the McCormicks, requiring them to pay $257,343.00.  The Trustee agreed, as part of the compromise, to allow Timothy and Richard McCormick's proofs of claim, and further agreed to settle the state court action brought by New Cingular against the McCormicks.[1]  The bankruptcy court approved the compromise on October 5, 2007.  Presently before the Court is New Cingular's Appeal of that Order which, for the reasons set forth below, will be affirmed.[2]

## BACKGROUND[3]

The McCormicks are the owners and principal shareholders of Wire Comm.  Wire Comm operated New Cingular retail stores in which it sold cellular phone equipment and services.  New Cingular alleges it voluntarily advanced Wire Comm $934,797.47 in late 2004 and early 2005 to cover delays in resolving commission disputes.

//

After taking into account commissions due Wire Comm, New Cingular

---

[1] The Trustee's contention that New Cingular's state court action became the property of the bankruptcy estate upon commencement of Wire Comm's bankruptcy was accepted by the State Court, which entered an Order on December 6, 2007 substituting the Trustee as Plaintiff in that proceeding in the place of New Cingular.  (Appellee's R. 279-287.)

[2] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).

[3] Unless otherwise noted, all factual assertions in this section are based on allegations in the Appellant's Brief and the Appellees' Brief.

2

claims Wire Comm still owed a net $864,192.47 in un-recouped advances. New Cingular alleges that after a brief meeting with Wire Comm president Timothy McCormick to discuss repayment of this balance in June 2005, Wire Comm terminated the dealer agreement. After adding the outstanding balance for equipment Wire Comm had purchased, New Cingular calculated Wire Comm's total debt at $1,066,295.70.

Following its termination of the dealer agreement with New Cingular, the McCormicks set up a new corporation, Premiere Wireless Solutions ("Premiere"). Premiere operated as a dealer of Verizon Wireless products. New Cingular alleges that Richard and Shirley McCormick were Premiere's shareholders. There is conflicting testimony as to the extent of Timothy McCormick's affiliation with the new company. When deposed, he stated he only "help[ed] out occasionally" (Appellant's App. 197:12-14), while the testimony of his mother (Appellant's App. 312:9-313:12) and Wire Comm's bookkeeper Kathy Witry (Appellant's App. 266:8-25) suggest a greater involvement. Ms. Witry testified Mr. McCormick was among three people who "ran the company." (Appellant's App. 267:19-22.)

New Cingular claims Wire Comm transferred over $500,000.00 in cash and assets to Premiere. Wire Comm's bank account statement shows a net portfolio value of $573,226.31 in June 2005, the month of Wire Comm's termination notice. (Appellant's App. 135.) By December 2005, the account's net portfolio value was $59.36. Id.

///

Timothy McCormick admitted Wire Comm received no compensation for

Premiere's assumption of the leases, the physical assets, the money transferred, and accessories in the former Wire Comm stores.  (Appellant's App. 209:8-14.)

New Cingular further alleges the McCormicks personally assumed other Wire Comm assets.  Both New Cingular and the Trustee, for example, believes that while Richard and Shirley McCormick held legal title to a Fresno residence, Wire Comm held equitable title.  (Appellant's App. 11:7-9.)  The McCormicks kept the $261,000.00 in proceeds from the sale of this property.  (Appellant's App. 33-36.)  The Trustee also noted that Wire Comm made the down payment and mortgage payments for a Las Vegas condominium, listing it as an asset on Wire Comm's tax returns.  (Appellant's App. 11:26-12:2.)  Renee McCormick sold the condominium in April 2007, and kept the $257,343.00 in profits.  (Appellant's App. 11:25-26.)

In September 2005, soon after termination of its dealer agreement with New Cingular, Wire Comm commenced an arbitration proceeding against New Cingular to seek recovery of unpaid commissions which it claimed totaled approximately $1,225,000.00.  New Cingular counterclaimed for reimbursement of debts totaling $1,120,825.70 and for damages totaling $1,828,887.47.  In addition, before the arbitration hearing was scheduled to take place, New Cingular filed a Complaint in state court against the McCormicks, alleging alter ego fraudulent transfer and alter ego aiding and abetting fraudulent transfer.

///
///

On December 8, 2006, Wire Comm filed for bankruptcy under

Chapter 7 of the United States Bankruptcy Code.  The arbitration hearing, set to begin on December 12, was suspended because of that bankruptcy filing.  On February 6, 2007, New Cingular filed a proof of claim with the bankruptcy estate in the amount of $2,949,703.17.

In July 2007, the Trustee entered into a settlement agreement with the McCormicks, who agreed to pay the bankruptcy estate $257,343.00 in exchange for allowing Timothy and Richard McCormick's proofs of claim, and for settling New Cingular's state law causes of action against the McCormicks.

On August 7, 2007, Trustee moved to approve the compromise. After a hearing on October 2, 2007, the bankruptcy court issued an Order granting Trustee's motion.  New Cingular filed a Notice of Appeal on October 18, 2007 challenging that approval.

**STANDARD**

A bankruptcy court, on motion by the trustee and after notice and a hearing, may approve a compromise.  Fed. R. Bankr. P. 9019(a).  "[T]he bankruptcy court's order approving the trustee's application to compromise the controversy is reviewed for an abuse of discretion."  Martin v. Kane (In re A & C Props.), 784 F.2d 1377, 1380 (9th Cir. 1986).  While the bankruptcy court has great latitude in approving compromise agreements, the court's discretion is not unlimited.  Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988).
"The court may approve a compromise only if it is fair and

1 equitable." Id. (internal quotations omitted). If the
2 bankruptcy court amply considered the various factors that
3 determine the reasonableness of the compromise, that court's
4 decision must be affirmed. In re A & C Props., 784 F.2d at 1381.
5 Reversal for abuse of discretion is not appropriate unless the
6 Court has a "definite and firm conviction" that the court below
7 "committed a clear error of judgment." Marchand v. Mercy Med.
8 Ctr., 22 F.3d 933, 936 (9th Cir. 1994) (citing United States v.
9 Plainbull, 957 F.2d 724, 725 (9th Cir. 1992)). If the bankruptcy
10 court "amply considered the various factors that determined the
11 reasonableness of the compromise, the court's decision must be
12 affirmed." In re A & C Props., 784 F.2d at 1381.

A court, in determining the fairness, reasonableness, and adequacy of a proposed settlement agreement, must consider

> (a) [t]he probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Id. As the party proposing the compromise, the trustee "has the burden of persuading the bankruptcy court that the compromise is fair and equitable, and should be approved." Id.

///
///
///
///
///
///

**ANALYSIS**

6

The October 2, 2007 hearing transcript on the compromise settlement reveals that the bankruptcy court considered the four criteria set forth in In re A & C Properties before determining that the compromise with the McCormicks was fair and equitable. As the judge stated, "I understand the standards that come from the Supreme Court decision in TMT Trailer Ferry, which have come down to us in the Ninth Circuit through cases such as Woodson and A & C Properties, and these are the standards that I'm applying." (Appellees' R. 263:20-24.)  While acknowledging that "some factors . . . cut the other way" (Appellees' R. 263:16-17), the bankruptcy judge also noted that his decision to approve the compromise was "ultimately . . . a matter of discretion" (Appellees' R. 263:17-19).  This Court now examines the four A & C Properties standards to determine whether the bankruptcy court abused its discretion in approving the compromise at issue in this case.

**1.   Probability of Success**

It is unclear whether New Cingular will prevail on its proof of claim against the Debtor.  In its Brief, New Cingular relies exclusively on its own state court complaint against the McCormicks, Wire Comm, and Premiere to support allegations of Wire Comm's $1,066,295.70 debt to New Cingular.  New Cingular has cited no authority other than its own unsubstantiated allegations to bolster its claim.

Additionally, if New Cingular were convinced of the success of

7

its $2,949,703.17 proof of claim, it could itself have purchased the cause of action in that regard from the Trustee. New Cingular elected not to do so. (Appellee's R. 223:13-17.)

Although New Cingular has presented some evidence to support its state law claims against the McCormicks for alter ego fraudulent transfer and alter ego aiding and abetting fraudulent transfer, success on those causes of action is similarly uncertain. Under the Uniform Fraudulent Transfer Act ("UFTA"), "[a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor . . . [and] [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation . . . ." Cal. Civ. Code § 3439.04(a)(1)-(2). Additionally, the debtor must have "engaged . . . in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," and must have "[i]ntended to incur . . . debts beyond his or her ability to pay as they became due." Cal. Civ. Code § 3439.04(a)(2)(A)-(B). The UFTA sets forth eleven factors for a court to consider in determining actual intent to hinder, delay, or defraud. Cal. Civ. Code § 3439.04(b)(1)-(11).

New Cingular has presented a colorable claim that, under the UFTA factors, the McCormicks had intent to hinder, delay, or defraud. Cal. Civ. Code § 3439.04(a)(1). The transfers were made from Wire Comm to "an insider" – either, as New Cingular alleges, to the McCormicks, or to Premiere, which the McCormicks owned. Cal. Civ. Code § 3439.04(b)(1). The transfers from Wire Comm to

8

Premiere were "of substantially all the debtor's assets." Cal. Civ. Code § 3439.04(b)(5). As Timothy McCormick admitted in his deposition, Wire Comm received no compensation for Premiere's assumption of the leases, the physical assets, the money transferred, and accessories in the former Wire Comm stores. Thus, the value of the consideration Wire Comm received was not "reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." Cal. Civ. Code § 3439.04(b)(8).

That Premiere did not receive a "reasonably equivalent value" in exchange for Wire Comm's assets satisfies the second element of the UFTA's test for a fraudulent transfer. Cal. Civ. Code § 3439.04(a)(2). Again, Timothy McCormick's admission that Wire Comm received no compensation from Premiere suggests New Cingular could prevail on this charge.

As the McCormicks point out, however, New Cingular must do more to prove the fraudulent transfer and aiding and abetting fraudulent transfer claims. Specifically, New Cingular would have to overcome the McCormicks' likely arguments that they formed Premiere because Wire Comm was contractually prohibited from operating as a Verizon dealer (rather than to defraud New Cingular). (Appellee's Br. 22.) New Cingular would also have to address the McCormicks' contention that New Cingular is actually a debtor to Wire Comm. (Appellee's Br. 22-23.) Moreover, the McCormicks claim they paid most of the other creditors from their own personal funds. (Appellee's Br. 22.)
///
Finally, because a creditor may only recover a fraudulent

9

transfer from a transferee or a subsequent transferee, New Cingular would have to prove the transfer passed through Premiere to one of the McCormicks.

California recognizes alter ego relationships, permitting a corporation's liabilities to be imposed on an individual or entity, when two conditions are satisfied: (1) "there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased," and (2) "an adherence to the fiction of the separate existence of the corporation would . . . sanction a fraud or promote injustice." Wood v. Elling Corp., 20 Cal. 3d 353, 365 n.9 (1977). The alter ego doctrine is, however, an equitable doctrine which courts use to assure a just and equitable result. NEC Elecs. Inc. v. Hurt, 208 Cal. App. 3d 772, 777 (Cal. Ct. App. 1989) (internal citation omitted). Whether the corporate entity may be disregarded, and the alter ego doctrine applied, "is within the province of the trial court." Wincar Welders v. Leebrick, 186 Cal. App. 2d 195, 199 (Cal. Ct. App. 1960).

Given the commingling of Wire Comm's assets with those of the McCormicks, a state court could decide to apply the alter ego doctrine. As discussed, the McCormicks kept the $261,000.00 in proceeds from the sale of a Fresno residence to which Wire Comm is alleged to have held equitable title. (Appellant's App. 33-36.)

///
///
///

Moreover, while Wire Comm made the down payment and mortgage

10

payments for a Las Vegas condominium and listed it as an asset on Wire Comm's tax returns (Appellant's App. 11:26-12:2), Renee McCormick kept the $257,343 in profits after selling the condominium (Appellant's App. 11:25-26).  Despite New Cingular's charges that the McCormicks used Wire Comm funds for luxury automobiles, travel, and leisure activities (Appellant's Br. 29:3-10), excluding the profits retained from the sale of the Fresno and Las Vegas properties, Trustee did not identify "any transfer to the McCormicks during [the 1.5 years prior to the bankruptcy filing] other than wages." (Appellant's App. 12:25-27).

    Before approving the compromise between Trustee and the McCormicks, the bankruptcy judge considered the probability of success in the litigation.  Recognizing that he had "to figure out whether the compromise is fair and equitable, taking into account probability of successful litigation" (Appellees' R. 245:16-21), the bankruptcy found that the Trustee was faced with "a substantial struggle and expensive struggle that would take some period of time and some considerable expense" (Appellees' R. 262:14-18).  He also noted that "if the cause of action is as valuable as Cingular says it is, then it would purchase the cause of action anyway."  (Appellees' R. 263:11-13.)
///
///
///
///
///
    The probability that New Cingular would prevail in its proof

11

of claim against the Debtor is far from certain.  Although New Cingular's state law claims against the McCormicks for alter ego fraudulent transfer and alter ego aiding and abetting fraudulent transfer have some merit, the outcome of that litigation is by no means clear.  Thus, the first A & C Properties factor weighs in favor of approving the compromise.

### 2. Difficulties in Collection

While the bankruptcy judge found "some issue of collectibility against [the McCormicks]" (Appellees' R. 262:20-21), the Trustee's stipulations reveal this finding to be inaccurate as to Richard and Shirley McCormick.  At the hearing, the Trustee's attorney, Daniel Egan, specifically conceded that any judgment against Richard and Shirley would be collectible. (Appellees' R. 229:19-20.)  Mr. Egan added, however, that "transfers to Tim and Renee [McCormick] would not be collectible from Richard and Shirley." (Appellees' R. 229:21-22.)  In connection with the Motion for Order Approving Compromise, Tim and Renee McCormick submitted a financial statement showing non-exempt assets of no more than $69,650.00.  (Appellees' R. 99:18-24.)  Thus, while the bankruptcy judge's determination that "the McCormicks are not deep pockets" (Appellees' R. 262:19-20) may have been true as to Tim and Renee McCormick, the determination ignored Trustee's stipulation as to Richard and Shirley McCormick.

///

Given the couple's limited resources, collecting more than $69,650.00 from Tim and Renee McCormick could prove difficult. The same cannot be said for Richard and Shirley McCormick, against whom any judgment would be collectible. Thus, the second A & C Properties factor weighs in favor of approving the compromise as to Tim and Renee McCormick, but against approving the compromise as to Richard and Shirley McCormick.

### 3. Complexity, Expense, Inconvenience, and Delay of Litigation

To pursue New Cingular's proof of claim and state court alter ego claims of fraudulent transfer and aiding and abetting fraudulent transfer would require additional discovery and an indeterminate delay. As noted, New Cingular relies exclusively on its unsubstantiated state court Complaint to support allegations of Wire Comm's $1,066,295.70 debt. To prevail on its proof of claim, New Cingular would have to conduct additional discovery, requiring a further delay of this litigation. Additionally, to prove a fraudulent transfer under an alter ego theory, New Cingular would have to establish that the transfer of assets from Wire Comm passed through Premiere to one of the McCormicks. The additional discovery New Cingular would necessarily have to undertake would complicate this case, causing further delays and costs to both parties.

///
///
///
///

13

This Court is persuaded that the complexity, expense, inconvenience, and delay of litigation support approving the compromise. The bankruptcy judge recognized that "[s]hould a larger judgment be issued, the litigation itself could be relatively complex." (Appellees' R. 262:22-23.) He also noted that, if the Trustee were to elect to pursue litigation against the McCormicks, he would be "facing a substantial struggle that would take some period of time and some considerable expense." (Appellees' R. 262:14-18.) Thus, the third A & C Properties factor weighs in favor of approving the compromise.

### 4. Interest of Creditors and Deference to Their Reasonable Views

Although New Cingular has a strong interest in recovering its $2,949,713.17 proof of claim against Wire Comm, New Cingular has a separate interest in opposing the compromise. In addition to being Wire Comm's principal creditor, New Cingular is also the defendant in a suit brought by the Trustee. The compromise would provide Trustee with resources to fund this litigation against New Cingular. Judge Klein recognized this. (Appellees' R. 261:22-262:1.) In his view, this consideration supported approval of the compromise. The fourth and final A & C Properties therefore also weighs in favor of approving the compromise.

///
///
///
///

14

**CONCLUSION**

Before approving the compromise between Trustee and the McCormicks, the bankruptcy court applied the correct legal standard, properly considering the four factors set forth in Martin v. Kane (In re A & C Props.), 784 F.2d 1377, 1380 (9th Cir. 1986):  the probability of success in the litigation; difficulties in the matter of collection; the complexity, expense, inconvenience, and delay of the litigation; and the interest of the creditors and a proper deference to their reasonable views.  Recognizing that "some factors . . . cut the other way" (Appellees' R. 263:16-17), the bankruptcy court ultimately decided the compromise was fair and equitable, and approved it.  The bankruptcy judge did not abuse his discretion in making this determination.  Because he "amply considered the various factors that determined the reasonableness of the compromise," In re A & C Properties, 784 F.2d at 1381, the decision of the Bankruptcy Court is AFFIRMED.

IT IS SO ORDERED.

Dated: September 10, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE